United States Court of Appeals,

Eleventh Circuit.

No. 95-6465.

Pamela Y. TROTTER, Plaintiff,

Rhonda Coleman;  Sonia Floyd, Plaintiffs-Appellants,

v.

The BOARD OF TRUSTEES OF the UNIVERSITY OF ALABAMA, a body corporate, for its division University of Alabama at Birmingham, Defendant-Appellee.

Aug. 20, 1996.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV94-B-348-S), Sharon L. Blackburn, Judge.

Before ANDERSON, Circuit Judge, and GODBOLD and RONEY, Senior Circuit Judges.

ANDERSON, Circuit Judge:

In this appeal, plaintiffs-appellants Rhonda Coleman and Sonia Floyd ("plaintiffs") contest the district court's order granting defendant-appellee Board of Trustees of the University of Alabama ("the Board") judgment as a matter of law on the plaintiffs' Title VII race discrimination claims.  For the reasons set forth below, we affirm.

I. STATEMENT OF THE CASE

A. *Background Facts*

Coleman and Floyd, both of whom are African-American, were unit secretaries employed at the University of Alabama Hospital in Birmingham ("the hospital").  Coleman was hired in early June of 1992 at a wage of $6.00 per hour, and Floyd was hired in late September of 1992 at a wage of $5.62 per hour.  Around the middle of October 1992, Charles Russell, a caucasian, was hired by the

hospital as a unit secretary at a wage of $6.50 per hour. All three were hired to work in the diabetes unit. There is no dispute that both Coleman and Floyd have more experience working in a hospital setting than Russell.

The head nurse of each unit at the hospital is responsible for hiring and supervising the unit secretaries. Nicky Ennis was the head nurse in the diabetes unit until November 1, 1992. However, by the time Russell was hired in October of that year, Ennis had been named head nurse of another unit, and she was actively engaged in interviewing job applicants and staffing that unit. Her administrative duties in the diabetes unit, including staffing and interviewing responsibilities, were performed by Debbie Dement, a shift manager. Dement interviewed Russell and, after consulting briefly with Ennis, made the decision to send him to personnel with the recommendation that he be hired.

Coleman testified that in May of 1993, she went to Dement and told her that Russell was making more money than she was, even though he had less experience. Dement immediately called Harry Shugerman, the Senior Personnel Relations Representative, who began an investigation into the alleged pay disparities among secretaries in the diabetes unit. As a result of his investigation, Shugerman concluded that Russell's salary was an error, and that he should not have been given a higher salary than Coleman or Floyd. He reported these findings to the hospital's Director of Compensation, Patricia Townsend. Shugerman testified that, at the time that the plaintiffs and Russell were hired, there was no system in place at the hospital by which the salary of a new hire would be adjusted to

fit in appropriately with the salaries of those already hired, although that was to some extent the expectation within the human resources department. According to Shugerman, Townsend and Marilyn Gavin, the Associate Director of the hospital's human resources department, that expectation was not being met, and there were instances throughout the hospital of more senior employees receiving a lower salary than newer hires.[1]

Shortly after calling the matter to Dement's attention in May of 1993, Coleman and Floyd filed a complaint with the EEOC in June of 1993. Soon thereafter, the hospital acknowledged the error and offered to pay the plaintiffs the difference between their salaries and Russell's salary for the period during which he was employed at the hospital.[2] Shugerman testified that the plaintiffs initially refused this offer. After the new Mercer compensation system was implemented, Coleman and Floyd were paid a lump sum equal to the difference between what they had been paid and what Russell had been paid during the time that he was employed by the hospital.[3]

B. *Procedural History*

Coleman, Floyd and Pamela Trotter, who is not a party to this appeal, filed charges with the EEOC alleging discrimination in

---

[1]At the time that the events relevant to this case occurred, the hospital was in the process of instituting the Mercer Performance Recognition System. Townsend testified that the purpose of the new system was to standardize the pay structure and avoid disparities like the one at issue here. However, the Mercer system was not yet in place when Russell's salary was set.

[2]Russell resigned at the end of July 1993.

[3]Additional facts will be discussed in the course of our analysis.

compensation based on race and sex.  On February 14, 1994, Coleman, Floyd and Trotter filed suit against the Board in United States District Court, alleging sex and race discrimination in violation of Title VII, 42 U.S.C. § 1981 and the Equal Pay Act.  The district court dismissed Trotter's claims in their entirety, dismissed Coleman's and Floyd's sex discrimination claims under Title VII and the Equal Pay Act with the consent of the plaintiffs' counsel, and granted the Board's motion for summary judgment on the plaintiffs' § 1981 claim.  Coleman's and Floyd's Title VII race discrimination in compensation claims were tried before a jury.  At the conclusion of the evidence, but before the case was given to the jury for deliberation, the district court granted the Board's motion for judgment as a matter of law, and denied a similar motion by the plaintiffs.  In this appeal, the plaintiffs challenge only those rulings of the district court relating to their Title VII race discrimination claim, in which they alleged discrimination based on the disparity in compensation between themselves and Russell.

## II. ISSUES ON APPEAL

On appeal, plaintiffs-appellants challenge three of the district court's decisions:  (1) the district court's ruling that there was no direct evidence of discrimination on the part of the person who made the salary decision at issue in this case, (2) the court's ruling that the Board did satisfy its burden of producing evidence which would permit the finder of fact to conclude that the challenged salary decision had not been motivated by racial animus, and (3) the court's direction of a verdict against the plaintiffs after the close of the evidence.

III. ANALYSIS

A. *Standard of review*

We review the district court's grant of judgment as a matter of law *de novo,* applying the same standard that the district court applied in its ruling granting the motion. *Hessen v. Jaguar Cars,* 915 F.2d 641, 644 (11th Cir.1990). When evaluating the grant of judgment as a matter of law, the court

> should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).[4]

B. *Direct evidence of discrimination*

The plaintiffs argue that head nurse Nicky Ennis decided to pay Russell more than they were paid because Russell is white and they are African-Americans. They offered at trial the testimony of Juanita Lamb as proof of Ennis' discriminatory intent. Lamb is also a secretary in the diabetes unit. Lamb testified that she overheard Ennis explain to a doctor that the reason she left the emergency room in 1982, where she had worked as a nurse, was that she did not like taking orders from an African-American person. Lamb also described an incident that allegedly occurred when Ennis was on duty in the diabetes unit. According to Lamb, a white nurse

---

[4]Both the direct evidence and directed verdict issues involve the application of this standard.

whose name she could not recall dropped a pill on the floor in front of an African-American patient, and then tried to administer that same pill to the patient, who refused to take it. Lamb stated that Ennis tried to get the patient discharged because the patient was causing problems for one of her white employees.[5]

Statements indicating racial bias on the part of a decisionmaker in an employment setting can constitute direct evidence of racial discrimination in Title VII cases. *See Haynes v. W.C. Caye and Co., Inc.,* 52 F.3d 928, 931 (11th Cir.1995) ("Indeed, a statement that members of a racial minority in general ... are simply not competent enough to do a particular job would seem to be a classic example of direct evidence."); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (finding statement by decisionmaker that he would not let female plaintiff work in the washroom because then all women would want to

---

[5]With respect to both incidents related in the text, Lamb testified that Ennis used a racial slur to describe African-American persons during the course of those particular conversations. There is a conflict in the evidence with respect to racial bias on the part of Ennis in the foregoing incidents. On cross examination, Lamb could not recall when these incidents occurred. Ennis disputed Lamb's assertions. She said that the incident with the pill did not happen the way Lamb described it, because she specifically recalled that the patient in question was a white female, and she remembered reprimanding the nurse, Valorie Parrish, for trying to give her the pill. Ennis also testified that when she applied to become an emergency room nurse in 1977, she knew that the medical director was Dr. Rick Ransom, an African-American man, whom she stated is a personal friend of hers. Ennis insisted that her reasons for leaving the emergency room in 1982 were personal—her son was killed by a hit and run driver, and she could no longer tolerate the sight of injured children. In the posture of this case, we assume the truth of Lamb's version of events because a reasonable jury could resolve the conflict in favor of the plaintiffs and conclude that Ennis displayed racial bias.

work there "highly probative evidence of illegal discrimination.")

When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available. *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (where plaintiff provides direct evidence of a discriminatory motive, "the ultimate issue of discrimination is proved"); *Haynes v. W.C. Caye and Co., Inc.,* 52 F.3d 928, 931 (11th Cir.1995) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45, 109 S.Ct. 1775, 1787-88, 104 L.Ed.2d 268 (1989)) (once the plaintiff presents direct evidence of discriminatory motive, it is then left to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached even absent discriminatory intent).

We can assume *arguendo,* without deciding, that the evidence of bias on the part of Ennis might otherwise rise to the level of direct evidence. However, in this case Ennis was not involved in the challenged salary decision. For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring) ("Thus, stray remarks in the workplace, while perhaps probative of sexual harassment ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers

..."); *see also id.* at 251, 109 S.Ct. at 1791 (plurality opinion of Brennan, J.) (plaintiff must show that remarks played a part in a particular hiring decision).

In this case, there is no substantial evidence that Ennis had anything to do with deciding how much Russell would be paid. Dement, who had assumed Ennis' administrative duties in the diabetes unit while Ennis was engaged in setting up her new unit, conducted the actual interview with Russell. All of the evidence, including the documentary evidence and the testimony of a disinterested witness, Russell, confirms the fact that it was Dement who handled the hiring of Russell. Dement also testified that she never discussed salary with Russell. Russell's testimony confirms this. In addition, Ennis testified at trial that she did not meet with Russell prior to his hiring, and that she did not have any role in setting his salary.[6] Russell testified that he discussed his prospective salary only with Paige Lessig, an employment specialist in the human resources department at the hospital, with whom he met at Dement's behest after she recommended

---

[6]At an earlier deposition, Ennis testified that she interviewed Russell. However, as she explained in her testimony at trial, she obviously was mistaken. At the time of her deposition, she did not realize that Russell was interviewed and hired during the time when she was no longer actively participating in the interviews and hiring process in the diabetes unit. Rather, as noted above, in mid-October, 1992, when Russell was hired, Ennis had already been appointed the head nurse of another unit and was actively engaged in interviewing and staffing that unit, while Dement assumed those duties with regard to the diabetes unit. These facts, including the fact that it was Dement and not Ennis who interviewed Russell and recommended that he be hired, were confirmed by all of the evidence at trial, including the documentary evidence and the testimony of a disinterested witness, Russell. No reasonable juror could conclude that Ennis was involved in setting Russell's salary.

that he be hired.  According to the testimony of Ennis, Dement, Patricia Townsend and Marilyn Gavin, the human resources department is responsible for setting the salaries of secretaries within the medical nursing areas, which includes the diabetes unit.

Even assuming *arguendo* that Ennis made the statements attributed to her by Lamb, there is no substantial evidence that Ennis was a decisionmaker when it came to salaries in general and to Russell's salary in particular.  Neither plaintiff testified to that effect, nor did any other witness.[7]  At most, Ennis' words constitute "stray remarks in the workplace" and "statements by [a] nondecisionmaker" that do not constitute direct evidence of discrimination in compensation in the diabetes unit.  *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804-05;  *see also E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990).  We conclude that the evidence "so strongly and overwhelmingly" points to the fact that Ennis was not involved in the challenged salary decision that no reasonable juror could conclude otherwise.  Thus, the plaintiffs cannot rely upon the evidence of discriminatory intent on the part of Ennis to prove that the challenged salary decision was racially motivated.

C. *Circumstantial evidence of discrimination*

Despite the fact that the plaintiffs have presented no direct evidence of discrimination, they may still have sufficient

---

[7]Although the evidence might raise an inference, *see* n. 8, *infra,* that the person in the diabetes unit who interviewed and recommended hiring Russell would have been consulted about and would have approved his salary, Ennis did neither.  During that entire time Dement, and not Ennis, performed those functions as acting head nurse.

circumstantial evidence of discrimination to reach the jury.  We evaluate Title VII claims supported by circumstantial evidence using the familiar framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Initially, the plaintiff has the burden of establishing a prima facie case of discrimination.  *Id.* at 802, 93 S.Ct. at 1824.  The plaintiffs' prima facie case gives rise to a presumption of discrimination.  *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993);  *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1060 (11th Cir.1994).  If the plaintiff establishes a prima facie case, the defendant has a burden of producing a legitimate, nondiscriminatory reason for the challenged action.  This places upon the defendant merely an intermediate burden of production.  *Turnes,* 36 F.3d at 1060.  To satisfy this burden of production, the "defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981).  In other words, a defendant satisfies its intermediate burden of production if it produces "admissible evidence which would allow the trier of fact to conclude that the employment decision *had not been* motivated by discriminatory animus." *Turnes,* 36 F.3d at 1061-62 (quoting *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095-96) (emphasis in *Turnes* ).  If a defendant succeeds in carrying its intermediate burden of production, the  *McDonnell*

*Douglas* framework, along with its presumption of discrimination, drops out of the case and the trier of fact proceeds to the ultimate issue of whether the plaintiff has proven that the defendant intentionally discriminated. *Id.* at 1061. On the other hand, "[w]here a plaintiff's prima facie case is established, but the employer fails to meet its burden of production, the unrebutted presumption of discrimination stands." *Id.*

If the defendant satisfies its burden of production, the plaintiff has an opportunity to show by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the factfinder that the defendant intentionally discriminated against the plaintiff. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94.

1. *The Board's Burden of Production*

The Board in this case does not argue that the plaintiffs failed to present a prima facie case creating a presumption of discrimination. Therefore, the first issue we address is whether the Board has satisfied its burden to produce evidence to rebut that presumption. The plaintiffs characterize the Board's attempt in this regard as consisting merely of an assertion that Russell was paid a higher salary than the plaintiffs because of a mistake. The plaintiffs argue that our holding in *Turnes* governs the disposition of this case.

In *Turnes,* the plaintiff applied for and was denied a job as a loan collector with the defendant bank. After Turnes filed a charge with the EEOC, the bank performed a credit check on him and discovered that he had a poor credit history. A bank officer testified at trial that his poor credit history would preclude the plaintiff from being considered as a loan collector with the bank. *Id.* at 1059-60. We noted that Turnes' credit history was discovered only after the bank made its decision not to hire him. *Id.* at 1061-62. Applying the *McDonnell Douglas* framework, we held that AmSouth had not satisfied its burden of production because it offered a justification which the employer "either did not know or did not consider at the time the decision was made." *Id.* at 1061. Because the after-acquired knowledge that Turnes had a bad credit history had to be disregarded, we held that AmSouth had come forward with "no explanation" at all for the challenged decision. *Id.* at 1062. We therefore held that Turnes' prima facie case and presumption of discrimination stood unrebutted. *Id.*

The plaintiffs argue that the instant case is identical to *Turnes* in that the Board's mistake theory amounts to no explanation at all. To evaluate the plaintiffs' argument, it is necessary to summarize the relevant evidence. We have already discussed the evidence of discrimination on the part of Ennis, and also the lack of involvement by Ennis in the challenged salary decision. We also noted above that the evidence indicates that Lessig made the salary decision at issue here.[8] Russell testified that he spoke only with

[8]The only evidence that anyone else was involved in setting Russell's salary comes from the deposition of Lessig, which was read at trial. Although her deposition confirms all the other

Lessig about his salary and that he told her he would not accept the position at a salary less than $6.50 per hour.  The Board adduced evidence that the human resources department was responsible for such salary decisions.  Lessig was the employment specialist who processed Russell, and she had been on the job for 10 months at the time she did so.  Employees in medical nursing, a group which includes both Russell and the plaintiffs, were not within Lessig's normal sphere of responsibility, and Lessig was not familiar with the hiring procedures in that area.  At the time Russell was hired, the human resources department was in the midst of filling 400 positions, four times the normal contingent of positions vacant at the hospital at any one time.  Lessig testified that Russell was the best qualified of the numerous candidates

---

evidence that the salary decision was made by her, Lessig also testified that the general practice followed when setting a rate of compensation was to consult with and rely on the unit, and that generally that would entail consulting with the head nurse. She testified that the unit (through the head nurse) would ordinarily approve the salary.  However, she did not know whether or not the head nurse in diabetes approved Russell's salary.  As noted above, it is undisputed that, although Ennis held the official position of head nurse until November 1, 1992, at the time Russell was hired in mid-October 1992 she had already been appointed head nurse of another unit and was interviewing applicants and staffing that unit.  Dement was acting as head nurse and performing those functions in the diabetes unit where Russell was employed.  It is also clear that it was Dement, and not Ennis, who interviewed Russell.  Thus, when Lessig testified that the unit would generally be consulted and would approve a salary decision, the only reasonable inference in light of all of the evidence is that the person consulted in this case would have been Dement, not Ennis.  Although Lessig's deposition raises an inference that Dement had some involvement in the challenged salary decision, that provides no support for the plaintiffs' case, because there is no evidence of discriminatory intent on the part of Dement.

available for the job. [9]    The plaintiffs offered absolutely no evidence of racial animus on the part of Lessig, or indeed on the part of Dement or *anyone* except Ennis.   Indeed, the plaintiffs offered no evidence that Lessig even knew that the plaintiffs were African-American.

In view of the foregoing evidence, we reject the plaintiffs' argument that this case is just like *Turnes.*  Unlike *Turnes,* in which there was no explanation at all, the Board in the instant case presented substantial evidence which tended to rebut the plaintiffs' presumption of discrimination.  The Board presented, *inter alia,* evidence on the basis of which a reasonable factfinder could conclude the following:  that the person with respect to whom the plaintiffs' evidence attributes racial discrimination, Ennis, had no involvement at all in the salary decision at issue;  that the person who made the challenged salary decision was Lessig;  that Lessig was a new employee who was unfamiliar with the relevant procedures and who was placed in the relevant position by the strained circumstances of the need to fill four times the normal vacancies;   that Lessig's salary decision was based upon the judgment the Russell was the best qualified of the candidates then available and the fact that Russell told Lessig that he would not work for less than $6.50 an hour;   and, most significantly, that Lessig did not even know at the time the race of the plaintiffs. [10]

---

[9]Of course, plaintiffs had been hired earlier and were not in the pool of candidates at the time.

[10]Not only was there no evidence of racial animus on the part of Lessig, there was also evidence that she did not even know the plaintiffs' salaries or the salaries of other secretaries in the diabetes unit.  Ennis testified that she never

Under these circumstances, it cannot be said that the Board offered no explanation for the salary decision at issue. It is important to recall the dimensions of the Board's burden of production. It is required merely to adduce evidence that raises a genuine issue of fact as to whether it discriminated against the plaintiffs or, in other words, to "produce admissible evidence which would allow the trier of fact to conclude that the employment decision *had not been* motivated by discriminatory animus." *Turnes,* 36 F.3d at 1061 (quoting from *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095-96) (emphasis added by *Turnes* )). As noted above, the Board's evidence did more than raise a genuine issue of fact about the noninvolvement of Ennis. The Board's evidence conclusively established that Ennis was not involved in the challenged salary decision. The Board's evidence was sufficient to create genuine issues of fact from which the factfinder could conclude that Lessig was the person who made the salary decision and that she made that decision because Russell was the best qualified of the available candidates and would not work for less than $6.50 per hour. We readily conclude that a factfinder could surmise that the salary

talked to Lessig or the human resources department about Russell. Dement, the person with whom Lessig did speak, testified that she first learned that Russell was paid $6.50 per hour only after the plaintiffs complained to her. Although other units of the hospital apparently were involved in setting the salaries for new hires, which perhaps explains Lessig's testimony to that effect, the Board presented evidence that the director of the nursing units had a firm policy that salaries should be determined exclusively by the human resources department, and that head nurses under her supervision, including Ennis and Dement, should not be involved. Thus, the evidence adduced by the Board permitted the jury to find that, with respect to the challenged salary decision, the decisionmaker, Lessig, did not know either the race of plaintiffs or the amount of their salaries and thus could not have intentionally discriminated.

decision was *not* motivated by discriminatory animus.  Thus, the Board has satisfied its burden of production.[11]

## 2. *The Directed Verdict*

The Board having satisfied its burden of production, the *McDonnell Douglas* presumption of discrimination drops out of the case, and the plaintiffs retain their ultimate burden of proving by a preponderance of the evidence that the salary decision was motivated by intentional discrimination.  As noted above, this issue went to trial, but the district court directed a verdict against the plaintiffs at the close of all of the evidence.  We review that ruling by employing the *Boeing* standard set forth above.

The *only* evidence of racial animus adduced by the plaintiffs pointed to racial animus on the part of Ennis.  However, as we demonstrated above, no reasonable juror could conclude based on the evidence before this jury that Ennis had any involvement in the determination of Russell's compensation.  Because Ennis was not involved in the challenged decision, the plaintiffs cannot rely upon possible racial animus on her part.  With respect to the

_____

[11]It is true that the Board's evidence does not *fully* explain why Russell was paid $6.50 per hour, which in light of his experience level apparently was higher than that to which he was entitled under the pay system then in operation.  The precise figure of $6.50 was apparently a mistake.  However, the defendant's intermediate burden of production merely requires a defendant to adduce evidence which would allow the factfinder to conclude that the employment decision was not racially motivated. As demonstrated above, defendants amply satisfied this burden. The parties in this case argue about whether or not evidence of a mistake can satisfy a defendant's burden of production.  However, the more appropriate inquiry is whether the circumstances revealed by the evidence, whether characterized as mistake or otherwise, permit the factfinder to conclude that the challenged decision was not racially motivated.

person who probably made the salary decision, Lessig, the plaintiffs adduced absolutely no evidence of discrimination.[12] The plaintiffs adduced absolutely no evidence that Lessig knew that they were African-Americans or that African-Americans in the diabetes unit were paid less than their white co-workers. [13] The inference created by the Board's evidence, that Lessig set the salary at $6.50 per hour because there was a need for new hires and because Russell was the best qualified candidate and would not work for less, remains unrebutted. There was simply no evidence at all that Lessig or any other possible decisionmaker was motivated by racial animus, and thus the plaintiffs have failed to carry their ultimate burden of persuasion. The evidence points "so strongly and overwhelmingly in favor of ... [the Board] that ... reasonable men could not arrive at a contrary verdict." *Boeing Co. v. Shipman,* 411 F.2d at 374. Accordingly, the district court properly directed a verdict against the plaintiffs at the close of all of the evidence.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[12]Indeed, plaintiffs adduced absolutely no evidence of discrimination on the part of *anyone* except Ennis. Even assuming *arguendo* that Lessig communicated with someone in the diabetes unit, one could not reasonably infer that Lessig consulted with Ennis because Ennis was no longer actually involved in administrative matters in that unit. Assuming *arguendo* that Lessig consulted with Dement does not help the plaintiffs because the plaintiffs adduced absolutely no evidence of discrimination on the part of Dement.

[13]In fact, there was no substantial evidence that African-Americans in the diabetes unit were paid less than their white counterparts.