Dr. Olubukunola C. THOMAS, Plaintiff,

v.

DADE COUNTY PUBLIC HEALTH TRUST and Metropolitan Dade County, a political subdivision of the State of Florida, Defendant.

No. 00CV2094.

United States District Court, S.D. Florida.

Sept. 20, 2001.

---

Stewart Lee Karlin, Fort Lauderdale, FL, for plaintiff.

Lee Allan Kraftchick, Dade County Attorney's Office, Miami, FL, for Defendant.

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (DE # 22), filed July 16, 2001. This motion is ripe for resolution, and the Court took oral argument on it on September 19, 2001. After a thorough review of the record and pleadings, and having considered the argument of counsel, the Defendant's Motion for Summary Judgment is GRANTED.

## INTRODUCTION

This is an action brought under the Civil Rights Act of 1964, Title VII. 42 U.S.C. § 2000 *et seq.* Plaintiff, Dr. Olubukunola Thomas ("Dr. Thomas"), claims that he was dismissed from his position with the Miami–Dade County Public Health Trust ("PHT")[1] because of his race and national origin in violation of Title VII.

## FACTUAL BACKGROUND

Plaintiff is a Black male of Nigerian ancestry. In January 1998, the PHT of-

---

1. Plaintiff dismissed his claim against the Defendant Metropolitan Dade County on September 19, 2001.

fered Dr. Thomas a residency position at Jackson Memorial Hospital which commenced in July 1998. *Affidavit of Dr. Fred Brindle* at ¶ 3, 4. Dr. Thomas was classified as a "Post Graduate Year Two" (PGY–2) resident, which means that he was in his second year of residency. He was also classified as a Clinical Anesthesiologist–1 (CA–1), which indicates that he was in his first year of training in anesthesiology. *Affidavit of Dr. Fred Brindle* at ¶¶ 3. Dr. Thomas had completed his initial year of residency at North General Hospital in New York. *Plaintiff's Depo.* at 9. He also completed an internship in Nigeria and worked in Lagos and the Bahamas before coming to the United States. *Plaintiff's Depo.* at 10–11. He had no previous training in anesthesiology. *Plaintiff's Depo.* at 12.

Dr. Thomas was appointed to an initial one year term in the residency program. His appointment was subject to one year renewals until the completion of his three year residency. *Affidavit of Dr. Fred Brindle* at ¶ 4. PHT's residency program is conducted under the auspices of the University of Miami Medical School. The program on a whole consists of approximately 1,000 residents. The anesthesiology program consists of approximately 80 residents. *Dr. Brindle's Affidavit* at ¶ 2. The residency program aims to train medical graduates to become proficient in their specialty and to practice independently. Residents gain increasing independence as they demonstrate increased knowledge and competence. They are required to undergo both academic and practical training, taking classes and examinations as well as performing medical procedures under the supervision of training physicians. *Dr. Brindle's Affidavit* at ¶ 5.

First year anesthesiology residents receive regular evaluations, on at least a monthly basis.[2] *Dr. Brindle's Affidavit* at ¶ 5. Dr. Thomas's performance was evaluated by approximately sixteen (16) physicians.[3] *Plaintiff's Depo.* at 25–27; *Exhibit 2 to Dr. Brindle's Affidavit.* His progress was also reviewed by the Department of Anesthesiology Directors, the Team Chiefs Committee and periodically by the Clinical Competency Committee ("CCC").[4] *Dr. Brindle's Affidavit* at ¶ 6. The Clinical Competency Committee makes a renewal recommendation to Dr. Craythorne upon its review of the supervising doctors' evaluation. The final decision to not renew his contract was made by Dr. Craythorne, the Chief of the Department of Anesthesiology.

In November or December 1998,[5] Dr. Thomas was informed by Dr. Craythorne and Dr. Brindle, the Chairman of the Clinical Competency Committee, that his contract would not be renewed for the following year.[6] *Dr. Brindle's Affidavit*

---

2. The evaluations are completed by supervising physicians at different hospitals associated with the residency program. Residents complete two to three month rotations at different hospitals.

3. The record reflects that a total of sixteen evaluations were submitted by supervising physicians. Eleven of those were monthly evaluations and four were daily evaluations. Three evaluations were signed by more than one doctor. *Exhibit 2 to Dr. Brindle's Affidavit.*

4. The CCC is comprised of seventeen (17) doctors and two chief residents. *Exhibit 4 to Dr. Brindle's Affidavit.*

5. There is some dispute as to the exact date of this meeting. Dr. Brindle states that the meeting occurred on November 20, 1998. *Dr. Brindle's Affidavit* at ¶ 10. Dr. Thomas agrees that he met with Drs. Craythorne and Brindle, but testified at his deposition that the meeting occurred on December 1, 1998. *Plaintiff's Dep.* at 64.

6. The collective bargaining agreement between the union representing the residents

at ¶ 10. Dr. Craythorne and Dr. Brindle stated that the Clinical Competency Committee was concerned about his performance in the program. *Dr. Brindle's Affidavit* at ¶ 10. In the period before receiving this notification, Dr. Thomas had received a number of negative evaluations. In August 1998, Dr. Thomas met with Dr. Desjardins to discuss his progress in the program. During that meeting, Dr. Desjardins expressed concerns about Dr. Thomas's technical skills. *Plaintiff's Dep.* at 39–40. In his evaluations written before the CCC's nonrenewal decision, Dr. Thomas received "satisfactory" marks for his knowledge base, but "marginal" to "unsatisfactory" marks from several evaluators with respect to his clinical skills. *Dr. Brindle's Affidavit* at ¶ 7, *Exhibit 2*. The CCC discussed Dr. Thomas's performance problems in its October 6, 1998 meeting, noting that he received negative evaluations from Dr. Candiotti and Dr. Furgang. *Exhibit 4 to Brindle's Affidavit (CCC Minutes)*. In its November 17, 1998 meeting, the CCC discussed Dr. Thomas's continued problems with clinical skills despite his good academic performance. *Exhibit 4 to Brindle's Affidavit*. The CCC also concluded that it would recommend to Dr. Craythorne that Dr. Thomas's residency contract should not be renewed. *Exhibit 4 to Brindle's Affidavit*.

During his meeting with Dr. Craythorne and Dr. Brindle, Dr. Thomas challenged the accuracy of the evaluations. *Brindle's Affidavit* at ¶ 10. Dr. Thomas did ·not mention any problems due to racial bias or bias based upon his national origin. *Plaintiff's Dep.* at 67. Dr. Thomas requested that the Department postpone its final nonrenewal decision until he had an opportunity to prove himself. Dr. Craythorne and Dr. Brindle informed him that

they would reconsider his renewal status if he showed improvement. *Brindle's Affidavit* at ¶ 10; *Plaintiff's Dep.* at 68–69.

The CCC again discussed Dr. Thomas's progress at its January 12, 1999 meeting. During the meeting, Dr. Brindle noted that the daily evaluations of Dr. Thomas's showed "slight improvement, as well as some problems with technical skills." The Committee also discussed a satisfactory evaluation from Dr. Gyamfi. Finally, the Committee agreed to give Dr. Thomas "overall satisfactory" marks in his six month report with "unsatisfactory" marks in certain areas, including the clinical skills area. *Exhibit 4 to Brindle's Affidavit.* Dr. Thomas continued to receive unsatisfactory performance evaluations from February through May 1999. *Brindle's Affidavit* at ¶ 11. On May 11, 1999, the CCC decided to affirm its initial decision to not renew Dr. Thomas's contract. *Brindle's Affidavit* at ¶ 13. The CCC relied upon the evaluations of Dr. Lieberman and Dr. Jacobo, which, among other things, noted that his performance was below average and suggested that he would perform better in a different specialty. *Exhibit 4 to Dr. Brindle's Affidavit.*

Dr. Thomas asserts that the decision to not renew his contract was based on his race and national origin. He argues that he was subjected to discriminatory treatment during his term as a resident. To support this assertion, Dr. Thomas points to the following instances: 1) During his rotation at Sylvester Cancer Center in October 1998, Dr. Deo (the then chief for anesthesiology residents at Sylvester Cancer Center) remarked that Dr. Thomas must be from Somalia and that he must have been starving in Somalia; In December 1998, Dr. Deo also asked Dr. Thomas if he had been fired; 2) A number of the

and the PHT requires the residency programs to inform residents of nonrenewals six

months after the start of their residency. *Dr. Brindle's Affidavit* at ¶ 10.

residents nicknamed him "Mandela"; 3) Dr. Walker, who signed one evaluation, suggested that Dr. Thomas used African incantation to successfully perform an intubation procedure; 4) Dr. Patin, who evaluated plaintiff, laughed at Dr. Walker's comment; 5) During Dr. Thomas's rotation at Bascom Palmer Hospital, Dr. Morales (the team chief) frequently called him "Mandela" and once asked him how intubations were done in Nigeria; 6) Dr. Urrego started the "Mandela" nickname. *Plaintiff's Declaration* at ¶¶ 4–10.

Plaintiff also points to the defendants failure to follow certain procedures required by its collective bargaining agreement with the residents' union as evidence of discrimination. Dr. Thomas states that he never received copies of his performance evaluations in accordance with the collective bargaining agreement. *Plaintiff's Declaration* at ¶ 18. He also charges that he did not receive notice that he was in danger of being discharged from the residency program until November 27, 1998, when he received a letter of nonrenewal from Dr. Brindle and Craythorne. *Plaintiff's Declaration* at ¶ 18. Plaintiff also challenges the accuracy of the evaluations he received.

The PHT asserts that its decision was based solely upon Dr. Thomas's unsatisfactory performance in the residency program.

## LEGAL STANDARD

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In applying this stan-

dard, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Arrington v. Cobb County*, 139 F.3d 865, 871 (11th Cir.1998); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

The non-moving party, however, bears the burden of coming forward with evidence of each essential element of its claims, such that a reasonable jury could find in its favor. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. *See Earley*, 907 F.2d at 1081. The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The Court measures the motion for summary judgment against these standards.

## ANALYSIS

■ Under Title VII it is unlawful for an employer to "fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condi-

tions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.2000e–2. A plaintiff may establish a case of discrimination under Title VII by offering three types of evidence: (1) statistical evidence of a pattern of discrimination; (2) direct evidence of discrimination; or, (3) circumstantial evidence of discrimination. *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998); *see also Holifield v. Reno,* 115 F.3d 1555, 1561 (11th Cir.1997); *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989) (direct evidence); *Coutu v. Martin County Bd. of County Comm'rs.,* 47 F.3d 1068, 1073 (11th Cir.1995) (circumstantial evidence). No statistical evidence was presented by plaintiff.

■ Direct evidence of discrimination under Title VII is evidence that, if believed, would establish that the employer's decision was based upon discriminatory intent without inference or presumption. *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1286 (11th Cir.2000) (quoting *Standard,* 161 F.3d 1318, 1330). Evidence that is subject to multiple interpretations or that merely suggests discrimination does not constitute direct evidence. *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997). "If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent." *Standard,* 161 F.3d at 1330; *see also E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1071 (11th Cir. 1990).

Discriminatory statements may constitute direct evidence of discrimination where such statements are by decisionmakers or are related to the decisionmaking process. *See Standard,* 161 F.3d at 1330 ("remarks by non-decisionmakers or

remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."); *see also Trotter v. Board of Trustees of the Univ. of Alabama,* 91 F.3d 1449, 1453 (11th Cir.1996) ("Statements indicating racial bias on the part of a decisionmaker in an employment setting can constitute direct evidence of racial discrimination in Title VII cases.").

■ Plaintiff has failed to establish a prima facie case of discrimination through direct evidence to survive summary judgment. Dr. Thomas contends that the statements made by several doctors constitute direct evidence of discriminatory intent in the PHT's decision to discontinue his contract. The statements, however, do not constitute direct evidence of discrimination. None of the statements are related to the decisionmaking process. In addition, any connection to the decisionmaking process is very attenuated. Of the doctors who the plaintiff asserts made derogatory statements concerning his national origin, only two arguably had any connection with the decisionmaking process and none were final or even intermediate decisionmakers with respect to his nonrenewal. Dr. Walker, accused of stating that the plaintiff used African incantation to successfully perform a medical procedure, signed one of the plaintiff's evaluations. *Plaintiff's Declaration* at ¶ 6. Dr. Patin, who laughed when Dr. Walker made this statement, also signed that particular evaluation. *Plaintiff's Declaration* at ¶ 7. The evaluation discussed Dr. Thomas's progress during the month of October. This evaluation was discussed during the November 11, 1998 CCC meeting. However, the CCC discussed other negative evaluations of the plaintiff at this meeting, previous meetings and subsequent meetings. Indeed, the record reflects that the CCC based its final recommendation, not on this evalua-

tion, but on subsequent evaluations. The CCC primarily based its final recommendation upon evaluations performed by Drs. Lieberman and Jacobo. *Exhibit 4 to Dr. Brindle's Affidavit (May 11, 1999 CCC Meeting Minutes).*[7] Neither Dr. Lieberman nor Dr. Jacobo made racially biased comments against Dr. Thomas. *Plaintiff's Deposition* at 35.

Considering the evidence in the light most favorable to the plaintiff, the Court further considers Dr. Patin's connection to the decisionmaking process and finds that it is too attenuated to support the plaintiff's discrimination claim. The plaintiff essentially argues that Dr. Patin's reaction to Dr. Walker's statement (that plaintiff used African incantation in a medical procedure) should be considered direct evidence of discrimination. As explained above, the decision to not renew Dr. Thomas's contract was made by Dr. Craythorne, taking into account the CCC's recommendation. The CCC is comprised of approximately 19 members and chaired by Dr. Brindle. *Brindle's Affidavit* at ¶ 1; *Exhibit 4 to Brindle's Affidavit.* The evidence submitted reflects that Dr. Patin was a member of the CCC. *Exhibit 4 to Brindle's Affidavit.* Dr. Patin only attended one CCC meeting in which Dr. Thomas's progress was discussed. *Exhibit 4 to Brindle's Affidavit.* He attended the November 11, 1998 meeting in which the CCC made its initial decision to recommend nonrenewal. The minutes of the meeting, however, do not reflect any participation by Dr. Patin in this meeting. *Exhibit 4 to Dr. Brindle's Affidavit.* Dr. Thomas's progress was discussed at four other CCC meetings; three of those meetings occurred after the November 11 meeting. Dr. Patin was not in attendance at any of those later meetings, including the meeting in which the final decision was made to recommend nonrenewal. Any connection to the decisionmaking process was too far removed to support any argument of direct evidence of discrimination.

The statements themselves do not amount to a prima facie case of discriminatory intent sufficient to survive summary judgment. The statements, while inappropriate, further do not amount to direct evidence of discrimination as they are not analogous to the blatant statements previously recognized by the Eleventh Circuit and they are not connected to the decisionmaking process. *See e.g. Haynes v. W.C. Caye & Company, Inc.,* 52 F.3d 928 (11th Cir.1995) (ruling that a statement by the company's president that women were not competent enough for a particular job constituted direct evidence of discrimination); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir.1990) (holding that racial slurs made by the company's general manager responsible for promotions constituted direct evidence of discrimination.). The statements are wholly unrelated to the decisionmaking process and they are not made by the decisionmakers and as such do not constitute direct evidence discrimination. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 (11th Cir.1998).

Absent direct evidence of discrimination, the Court further analyzes plaintiff's claim of discrimination under the familiar

---

**7.** There is no mention of the evaluation signed by Drs. Patin and Walker during this meeting. Instead, the CCC discussed Dr. Lieberman's February evaluation, the March evaluation from Drs. Lieberman and Jacobo and the April evaluation by Drs. Lieberman and Jacobo. For example, the meeting minutes note that a "subsequent March MSH evaluation from Dr. Lieberman and Dr. Jacobo notes that while Dr. Thomas showed improvement during his first month, he regressed significantly this month. Dr. Thomas' technical skills deteriorated and he became more unsure of himself." *Exhibit 4 to Dr. Brindle's Affidavit (May 11, 1999 CCC Meeting Minutes).*

*McDonnell Douglas* burden shifting framework, generally used to evaluate discrimination claims based upon circumstantial evidence. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Denney v. City of Albany,* 247 F.3d 1172 (11th Cir.2001); *Chapman v. AI Transport,* 229 F.3d 1012 (11th Cir.2000). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *Coutu,* 47 F.3d at 1073. Establishment of a prima facie case creates the presumption of discrimination by the employer. If the plaintiff establishes a prima facie case, the defendant must then articulate a legitimate, non-discriminatory, reason for its challenged action. *See Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir.1997), *cert. denied,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). The burden then shifts to the plaintiff to demonstrate that the employer's proffered reasons for taking the actions are actually a pretext for discrimination. *See id.* at 1538. The ultimate burden of persuasion remains with the plaintiff at all times. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

■ To establish a *prima facie* case of discrimination under Title VII, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and, (4) his employer treated similarly situated employees who are not members of the plaintiff's class more favorably. *See Rice–Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 842–843 (11th Cir.2000); *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.

1999); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Establishing the prima facie case is not an onerous task; it requires only that the plaintiff demonstrate facts adequate to permit an inference of discrimination. *See Holifield,* 115 F.3d at 1562.

■ It is undisputed that plaintiff has established two elements of his prima facie case: that he is a member of the protected class and that he was subjected to adverse action. PHT, however, asserts that Dr. Thomas was not qualified. Plaintiff presented evidence which contests this argument. *Plaintiff's Memorandum of Law* at 3–4. Viewing this evidence in the light most favorable to the non-movant, the Court finds that the plaintiff has established this element of his prima facie case. PHT also asserts that plaintiff has not demonstrated that it treated similarly situated non-minority employees more favorably than him. The Court finds that the plaintiff has failed to establish this element of his prima facie case.

■ The Court finds that the plaintiff has failed to establish his prima facie case by failing to present evidence that PHT treated similarly situated medical residents outside his classification more favorably. Such evidence must be presented to meet plaintiff's initial burden of establishing a prima facie case of discrimination. *See Rice–Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 842–843; *Maniccia v. Brown,* 171 F.3d 1364; *Holifield v. Reno,* 115 F.3d 1555, 1562. Plaintiff points to the PHT's failure to follow certain of the procedures outlined in its collective bargaining agreement as evidence of discrimination and disparate treatment.[8] Demonstrating a company's devia-

---

**8.** Dr. Thomas contends that he was treated unfairly because the PHT failed to consult him periodically about his progress and be-

cause he only received a copy of the evaluations after learning of the PHT's nonrenewal decision. *Plaintiff's Memorandum of Law.*

tion from its policy alone, however, is not sufficient to establish a prima facie case of discrimination. *Mitchell*, 186 F.3d 1352, 1355–56 ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."). The inconsistent application of an employer's policies can be circumstantial evidence of discrimination. *Berg v. Florida Department of Labor and Employment Security*, 163 F.3d 1251, 1255. However, plaintiff has presented no evidence showing application of these procedures to other residents and no evidence that the procedures were inconsistently applied. Plaintiff has failed to establish a prima facie case of discrimination and as such cannot survive summary judgment.

Even assuming that plaintiff has met its burden of establishing a prima facie case of discriminatory intent, he has not presented sufficient evidence to show that PHT's proffered legitimate, non-discriminatory reason for not renewing his contract is pretextual. Under the *McDonnell Douglas* burden shifting framework, once the plaintiff establishes its prima facie case, the defendant must then articulate a legitimate, non-discriminatory, reason for its challenged action. *Chapman*, 229 F.3d 1012, 1024. Defendant's burden is one of production and not one of persuasion. *See id; see also Standard*, 161 F.3d at 1331. PHT "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was made for a discriminatory reason." *Standard*, 161 F.3d at 1331. The defendant's articulation of its reasons "must be clear and reasonably specific." *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 258, 101 S.Ct. 1089. The plaintiff must then demonstrate that the employer's proffered reasons for taking the actions are actually a pretext for racial or national origin discrimination. The plaintiff may demonstrate pretext by showing that the employer's reasons are "unworthy

of credence" or by showing that the employer was more likely motivated by discriminatory reasons. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Evidence produced in support of plaintiff's prima facie case may be taken into account to determine whether defendant's proffered reasons are pretextual. *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. 1089).

▬ The defendant has met its burden of articulating a legitimate, non-discriminatory, reason for its decision to not renew Dr. Thomas's contract. PHT determined that Dr. Thomas was not suitable for its anesthesiology program because he "did not demonstrate sufficient progress." *Defendant's Memorandum in Support of Motion for Summary Judgment* at 15. The PHT points to the evaluations of Dr. Thomas which overwhelmingly indicate that his performance was rated by his supervisors as unsatisfactory. *Dr. Brindle's Affidavit* at ¶¶ 7, 8, 10, 11–13. After its initial decision, the PHT reconsidered Dr. Thomas's renewal status, providing him with the opportunity to improve his performance. *Dr. Brindle's Affidavit* at ¶ 10. Dr. Thomas's performance improved slightly during January 1999, but thereafter "deteriorated" and his "supervisors uniformly concluded that his performance was unsatisfactory and that he should not be retained." *Dr. Brindle's Affidavit* at ¶ 11. Defendant contends that its decision to terminate Dr. Thomas's participation in the program was based solely on his performance.

▬ Plaintiff challenges the correctness of the evaluations. *Plaintiff's Memorandum of Law*. Plaintiff's assertions of his satisfactory performance, however, do not demonstrate pretext. *Holifield*, 115

F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."). The plaintiff's disagreement with the evaluations are insufficient to demonstrate that the PHT's proffered reason should not be believed or that the PHT was more likely motivated by discriminatory reasons. Plaintiff specifically challenges the evaluations submitted by Drs. Condiotti, Furgang, Patin and Lieberman. *Plaintiff's Declaration* at ¶¶ 13, 14, 16, 31. However, with the exception of Dr. Patin, plaintiff has presented no evidence that these doctors acted in any racially biased way toward him or that they expressed any bias in relation to his national origin. As discussed above, Dr. Patin's connection to the decisionmaking process was very attenuated and his allegedly biased action does not support plaintiff's argument of discriminatory intent.

 Plaintiff also fails to demonstrate pretext by pointing to the inappropriate statements made by a number of the doctors with whom he worked. Statements that do not amount to direct evidence of pretext may constitute circumstantial evidence of pretext. *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n. 11. As discussed earlier, however, only one evaluation was completed by any doctor who made inappropriate statements. The statements themselves were unrelated to the decisionmaking process. The PHT's decision relied upon evaluations submitted by approximately fourteen other doctors, in addition to the evaluation signed by Drs. Patin and Walker. Indeed, the minutes of the final CCC meeting indicate that the CCC relied heavily on evaluations completed by Drs. Lieberman and Jacobo; neither doctor made biased remarks concerning Dr. Thomas. Dr. Craythorne made the final decision; he also made no biased remarks against the plaintiff. Plaintiff also fails to demonstrate pretext by arguing that the PHT deviated from some its procedures. He has presented no evidence that these procedures were inconsistently applied.

## CONCLUSION

Upon careful consideration of the record and for the reasons discussed above, the Court finds that summary judgment should be granted in this matter. Accordingly, it is hereby ORDERED AND ADJUDGED that the defendant's motion for summary judgment is GRANTED.