Wilma HARLEY, Plaintiff,

v.

THE HEALTH CENTER OF COCO-
NUT CREEK, INC., a Florida corpo-
ration, and Thomas and Thorngren,
Inc., a Tennessee corporation, Defen-
dants.

No. 04 61309 CIV.

United States District Court,
S.D. Florida.

May 10, 2006.

Order Denying Reconsideration
Sept. 27, 2006.

Chris Kleppin, Glasser, Boreth, Ceasar & Kleppin, Plantation, FL, for plaintiff.

Daniel H. Kunkel, Jennifer Fowler-Hermes, Kunkel, Miller & Hament, P.A., Sarasota, FL, for defendants.

## ORDER GRANTING IN PART/DENYING IN PART DEFENDANT THE HEALTH CENTER OF COCONUT CREEK, INC.'S MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendant The Health Center of Coconut Creek, Inc.'s ("Defendant") Motion for Summary Judgment and Memorandum of Law [DE 29, filed January 16, 2006].[1] The day it moved for summary judgment, Defendant also filed a Statement of Facts in Support of its Motion for Summary Judgment [DE 30]. On February 3, 2006, Plaintiff filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [DE 44].[2] Plaintiff also filed a Response to Defendant's Statement of Undisputed Material Facts [DE 45], and a Statement of Disputed Material Facts in Support of her Response to Defendant's Motion for Summary Judgment [DE 52], on February 2, 2006. On February 13, 2006, Defendant filed a Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment [DE 53] and Responses to Plaintiff's Statement of Undisputed [sic] Material Facts [DE 54].[3]

## I. Factual Background

### A. Plaintiff's Employment With Defendant

In July, 2000, Wilma Harley ("Plaintiff") began working as a Certified Nursing Assistant ("CNA") at a long-term health care center (the "Facility") run by an entity known as National Healthcare Corporation. (DSF at ¶¶ 1–2; PSF at ¶¶ 1–2). The Health Center of Coconut Creek, Inc. ("Defendant") took over operations at the Facility on October 1, 2000. (PSF at ¶ 1).

In connection with her hire, Plaintiff received a form entitled "Job Descrip-

1. On January 13, 2006, Defendant filed deposition transcripts of the following individuals: Virginia Hernandez [DE 31], Iona Sue Broughton [DE 32], Maureen Minkin [DE 33 & 34], Vinette G. Thomas [DE 35], Caridad Hernandez [DE 36], and Wilma Harley [DE 37 & 38].

2. On February 2, 2006, Plaintiff filed deposition transcripts, many of which were already of record. However, Plaintiff also filed the deposition transcript of Stewart Harap [DE 43], and the Unemployment Hearing Transcript taken February 3, 2003 [DE 48].

3. From henceforth, I will refer to statements contained within Defendant's Statement of Facts in Support of its Motion for Summary Judgment as "DSF"; statements contained within Plaintiff's Statement of Disputed Material Facts in Support of her Response to Defendant's Motion for Summary Judgment as "PSF"; statements contained within Plaintiff's Response to Defendant's Statement of Undisputed Material Facts as "PRF"; and Defendant's Responses to Plaintiff's Statement of Undisputed [sic] Facts as "DRF."

tion—Nursing Assistant." (Depo. of Wilma Harley, 121:12–122:16). According to that form, a CNA is expected to provide "direct and indirect patient care activities under the direction of a Registered Nurse or Licensed Practical Nurse." (Depo. of Wilma Harley, Ex. 7). She must also assist "patients with activities of daily living," and care for, comfort, and assist in the "maintenance of a safe and clean environment for an assigned group of residents." (Id.). A CNA is expected to: (1) be sensitive to patients' physical and psychosocial needs; (2) have a pleasant and cheerful personality; and (3) be tactful and have a courteous approach with patients and visitors. (Id.). Additionally, a CNA must be able to stand on her feet for 7–8 hours per day, and be able to lift 60–70 pounds "on a frequent basis." (Id.).

Also in connection with her employment, Plaintiff received a copy of Defendant's Employee Handbook. (DSF at ¶ 4). Plaintiff signed an Employee Acknowledgment Form indicating that she received a copy of the Employee Handbook, and understood that she was bound by its contents. (Depo. of Wilma Harley, Ex. 5). Among the items contained in the Employee Handbook is Defendant's policy on the Federal Medical Leave Act ("FMLA") leave. (DSF at ¶ 4). Defendant grants leave in accordance with the FMLA for, among other reasons, the birth of a child. (Depo. of Wilma Harley, Ex. 6). With respect to notice of FMLA leave, the policy provides that, "[w]hen your need for FMLA leave is foreseeable, you are required to give 30 days advance written notice of the dates of your leave. Please contact your supervisor and/or administrator about filling out an Application for Family or Medical Leave." (Id.).[4]

On March 31, 2003, Caridad Hernandez ("C. Hernandez") became Defendant's Facility Administrator. (DSF at ¶ 6). In May, 2003, Iona Sue Broughton ("Broughton") became Defendant's Director of Nursing, and reported to C. Hernandez. (Id.); (Depo. of Iona Sue Broughton, 11:4–11:7; Depo. of Wilma Harley, 29: 10–29: 12). Broughton changed certain policies at the Facility. (Depo. of Wilma Harley, 68:5–68:7). For example, Broughton denied Plaintiff her customary overtime work. (Depo. of Wilma Harley, 68:5–68:15). At all material times, Plaintiff worked a shift beginning at 3:00 p.m. and ending at 11:00 p.m. (DSF at ¶ 6). Plaintiff's direct supervisor was Vinette G. Thomas ("Thomas"). (PSF at ¶ 3). When Broughton became the Director of Nursing, Plaintiff served as team leader for the CNAs on her shift. (Depo. of Wilma Harley, 21:4–22:2). The position did not elevate Plaintiff above the other CNAs, although Plaintiff was expected to ensure that operations on her floor went smoothly. (Depo. of Wilma Harley, 22:3–22:7).

In April or May, 2003, Plaintiff learned she was pregnant. (DSF at ¶ 7). At some point, Broughton learned of Plaintiff's pregnancy.[5] (Depo. of Iona Sue Broughton,

---

4. Each party attempts to paint Plaintiff's employment history in a manner that favors its position. I am confused by this strategy given that, when the facts do not favor their position, each party denounces Plaintiff's performance history as irrelevant given the reason for Plaintiff's termination, to be discussed infra.

5. Plaintiff testified that Broughton was aware that she was pregnant in July of 2003 based on general knowledge in the workplace.

(Depo. of Wilma Harley, 19:14–19:24). Broughton transferred Plaintiff out of the team leader position and assigned Plaintiff to care for more bedridden patients, meaning that Plaintiff had to do considerably more heavy lifting than she had been doing. (Depo. of Wilma Harley, 22:21–22:5; 26:1–26:6). Broughton told Plaintiff that she transferred her out of the position because the position itself was unnecessary. (Depo. of Wilma Harley, 22:24–24:6). No one replaced Plaintiff as team leader while Plaintiff remained em-

67:12–67:15). Plaintiff requested a few days off from work in late June 2003 so that she could close on the purchase of a new home. (DSF at ¶ 9). Broughton denied the request. (*Id.*). Plaintiff then reiterated her request for time off with C. Hernandez, who is Broughton's supervisor. (*Id.*). C. Hernandez granted Plaintiff's request for leave. (*Id.*). In Plaintiff's mind, Broughton treated her unfairly from then on because she resented that Plaintiff spoke with her supervisor regarding a request for time off that she had denied. (Depo. of Wilma Harley, 65:19–67:10).

In early October, 2003, Plaintiff claims that she went to Broughton's office to inquire about maternity leave. (DSF at ¶ 11).[6] Although her baby was not due for several months, Plaintiff inquired about maternity leave early because Broughton had denied her earlier request for time off for the closing on her new home. (*Id.*). Plaintiff claims that Broughton told her to come back with her request for maternity leave in December. (*Id.*).

In mid-October, 2003, C. Hernandez and Maureen Minkin ("Minkin"), Defendant's Social Services Director, learned during their rounds about an incident involving a CNA and a resident. (Depo. of Maureen Minkin 50:25–51:19). On October 15, 2003, Minkin spoke with a resident named Stewart Harap ("Harap"). (DSF at ¶ 14). Harap complained that one of the CNAs intimidated him, but that he was reluctant to file a complaint because he feared retaliation. (DSF at ¶ 14). When Wilma Harley entered the room, Harap identified her to Minkin as the CNA who intimidated him. (*Id.*). Harap told Minkin that he did not want to formally report the incident until after Plaintiff had been discharged from the Facility. (Depo. of Maureen Minkin, 86:25–87:2).

After talking with Harap, Minkin drafted a grievance form. (DSF at ¶ 14). She also spoke with Harap's roommate concerning Harap's grievance. (*Id.*).

Sometime that week, while making rounds at the facility, C. Hernandez also learned from Harap that he had a problem with a CNA. (Depo. of Caridad Hernandez, 36:4–36:24; 242:2–242:21). The complaint was about "[the CNA's] attitude and what

ployed by Defendant. (Depo. of Wilma Harley, 24:14–24:17).

This testimony concerning Plaintiff's reassignment is irrelevant. In a footnote refuting Plaintiff's testimony regarding Broughton's discriminatory reasons for reassigning Plaintiff, including that Broughton was aware Plaintiff was pregnant at the time of the reassignment, Defendant refers to a document produced by Plaintiff during discovery. (DSF at ¶ 8 n. 4, Ex. 4). It purports to be a statement given by Plaintiff to the EEOC, and it discredits Plaintiff's testimony about the reassignment. Plaintiff characterizes the reassignment as of only "marginal relevance," because *"this case is about Harley's termination being associated with the invocation of her FMLA rights."* (PRF at ¶ 8) (emphasis added) Given Plaintiff's own admission of its irrelevance, there is no reason to address Plaintiff's reassignment in connection with Plaintiff's claims of retaliation and interfer-

ence. Another reason why this evidence is immaterial is that Plaintiff put forth an entirely different justification for Broughton's poor treatment of her around the time of reassignment: that she had spoken to Broughton's supervisor concerning a request that Broughton had herself denied. (Plaintiff's Depo. 66:3–67:10).

6. Plaintiff points out that at various times since her termination, Broughton has given inconsistent answers concerning whether she spoke with Plaintiff about her maternity leave. I have reviewed the relevant statements. Although Broughton could not remember the specific conversation concerning maternity leave, her testimony reveals that the conversation may have taken place. In any event, I read the inference in Plaintiff's favor, meaning that for purposes of this Order, I will assume that Plaintiff spoke with Broughton about taking maternity leave just two weeks prior to her termination.

had been going on in the past." (Depo. of Caridad Hernandez, 36:4–36:6). Harap told C. Hernandez that he had complained about Plaintiff once before, and in response, Plaintiff visited his room and told him not to complain anymore. (Depo. of Caridad Hernandez, 36:25–36:7). Harap did not specifically tell C. Hernandez to keep their communications confidential. (Depo. of Caridad Hernandez, 164:21–165:1).

It was not until October 16, 2003, that C. Hernandez identified Plaintiff as the CNA causing problems for Harap. (Depo. of Caridad Hernandez, 243:7–243:17). That morning, at a meeting of department heads and unit managers, C. Hernandez mentioned that she had concerns involving a situation between a resident and a CNA. (DSF at ¶ 16). Also present at the meeting were Broughton and Minkin. (Depo. of Iona Sue Broughton, 60:16–60:24). Minkin indicated that she was aware of the situation. (DSF at ¶ 16). C. Hernandez asked Minkin to speak with her privately about the situation following the meeting. (Id.). The two spoke about Harap's complaints concerning Plaintiff's treatment of him. (DSF at ¶ 17).

Following the meeting, Minkin called an abuse hotline to report Harap's complaint. (DSF at ¶ 18). However, Minkin did not provide Harap's name because Harap requested that the communications be kept confidential. (DSF at ¶ 18). She also talked with Harap's roommate and his roommate's wife regarding Harap's complaint. (Id. at ¶ 19). Also at the meeting was Carol Rosenbaum, Director of Dietary. (Id.). Harap joined the conversation already underway, and made the following accusations against Plaintiff: (1) she threw a snack at him and told him not bother her for the rest of the evening; (2) she left his roommate in the bathroom, and told him that she could not help him because she had a bad back; and (3) she was

uncaring, rude and mean. (Id.). (DSF at ¶ 19).

Broughton and C. Hernandez met to discuss what to do about the situation. (Depo. of Caridad Hernandez, 14:20–14:24; 20:2–20:14). They both agreed that the accusations against Plaintiff constituted a violation of Defendant's policies and procedures and required termination. (Id.). Broughton clarified, however, that she based her own decision on information obtained from others, including C. Hernandez and Minkin. (DRF at ¶¶ 24 and 25). Minkin assisted Broughton and C. Hernandez in deciding whether Plaintiff's actions violated the patient's rights, but she did not participate in the decision to terminate Plaintiff. (Depo. of Caridad Hernandez, 21:25–22:7).

Broughton testified at one point that she supported Plaintiff's termination because Harap "felt intimidated, he was fearful, and it was an unsafe environment." (Depo. of Iona Sue Broughton, 144:2–144:5). C. Hernandez confirmed that Harap's fear that Plaintiff would retaliate against him based on an experience involving a prior complaint contributed to her ultimate decision to terminate Plaintiff. (Depo. of Caridad Hernandez, 35:1–35:20). Harap reported to C. Hernandez that the complaint was about Plaintiff's attitude and "what had been going on in the past." (Depo. of Caridad Hernandez, 36:1–36:6). However, no one at the Facility could identify who Harap spoke with about his alleged prior complaint concerning Plaintiff. (PSF at ¶ 13). Minkin testified that she thought that Harap and his roommate may have confused two separate incidents involving each one of them into a combined story. (DRF at ¶ 13). The record does not establish with any specificity, including testimony given by Harap himself, that Plaintiff ever threatened him for reporting a previous incident. (PSF at ¶ 13).

On October 16, 2003, around 4:00 in the afternoon, Broughton told Plaintiff that she was terminated "based on abuse." (Depo. of Iona Sue Broughton, 63:22–65:2). Plaintiff asked for details concerning the circumstances leading to her termination, but Broughton declined to comment further. (Depo. of Iona Sue Broughton, 64:13–64:25). Plaintiff asked to speak to her supervisor, Thomas. (Depo. of Iona Sue Broughton, 64:19–64:22). Plaintiff spoke with Thomas for a short while, and appeared upset. (Depo. of Iona Sue Broughton, 65:13–66:9).

On October 17, 2003, Virginia Hernandez ("V. Hernandez"), Defendant's Risk Manager, learned of Harap's complaint. (DSF at ¶ 23). Harap told V. Hernandez that he wished to remain anonymous in connection with his complaint. (Depo. of Virginia Hernandez, 38:19–38:22). Normally, V. Hernandez investigates allegations of abuse at the Facility. (DSF at ¶ 23). V. Hernandez testified that she investigated the facts in this instance, but that she could not speak with Plaintiff because Plaintiff had already been fired by the time she became involved. (*Id.*). V. Hernandez completed the required risk management paperwork based on information she obtained from Broughton. (Depo. of Iona Sue Broughton, 39:11–39:23). She also spoke with Minkin about the incident. (Depo. of Virginia Hernandez, 53:13–53:16). On the paperwork, V. Hernandez identified the date of the incident as October 17, 2003. (Depo. of Virginia Hernandez, 44:14–44:16). It is undisputed that the incident occurred on October 16, 2003. V. Hernandez clarified the discrepancy as possibly resulting from her labeling the paperwork with the date she learned of the incident, as opposed to when it actually happened. (Depo. of Virginia Hernandez, 44:25–45:4; 62:4–62:10).

B.   Alleged Disputed Issues of Fact

Plaintiff claims that there is a dispute about who made the decision to terminate her. Broughton testified that she terminated Plaintiff. (Depo. of Iona Sue Broughton, 15:6–15:7). Just a few minutes later, however, Broughton clarified that although she alone informed Plaintiff of her termination, the decision to terminate Plaintiff was a joint one involving C. Hernandez. (Depo. of Caridad Hernandez, 17:1–17:23). At one point, C. Hernandez testified that the decision to terminate Plaintiff was a "giant decision between Sue Broughton and myself." (Depo. of Caridad Hernandez, 6:22–66:25). C. Hernandez also testified that she reached the decision to terminate Plaintiff. (Depo. of Caridad Hernandez, 13:17–13:24). When asked if Broughton was the decision-maker, C. Hernandez testified, "if [Ms. Broughton] felt she was, she was." (Depo. of Caridad Hernandez, 21:18–21:24).

Plaintiff also identifies a factual dispute surrounding the reasons given by Defendant's agents for her termination. At various times since Plaintiff's termination, Defendant's agents have described the termination as stemming from "allegations of abuse," "abuse," "alleged abuse," "alleged patient abuse," and "failure to uphold the resident's rights." (PRF at ¶ 22).

The parties also disagree about whether Defendant followed its policies in terminating Plaintiff. Plaintiff contends that Defendant did not follow its established procedures in disciplining CNAs accused of abuse in reaching the decision to terminate Plaintiff. Plaintiff points out that two CNAs accused of similar misconduct were suspended. (PSF at ¶ 21). Plaintiff also states that in a typical case of alleged CNA abuse against a resident, Defendant typically suspended the CNA before doing an investigation to determine if termination was appropriate. (PSF at ¶ 22). It

is undisputed that no one at the Facility spoke with Plaintiff regarding the allegations of abuse prior to her termination. (*Id.*). Moreover, there is no dispute that Defendant terminated Plaintiff without suspending her first.

Defendant counters that neither Broughton, nor C. Hernandez, rendered the disciplinary decisions involving the two CNAs referenced by Plaintiff. (DRF at ¶ 21). Defendant also challenges Plaintiff's accusation that it did not follow its established procedures in terminating her. The applicable policy governing termination *recommends* that the supervisor use a "Checklist for Termination from Employment." (PSF, Ex. N). Among the four disciplinary options available to a supervisor are: verbal and written counseling notices, written warnings, suspensions, and discharge without notice. (*Id.*). Nevertheless, the policy provides that sometimes circumstances "make it inadvisable or inappropriate to follow corrective disciplinary action and progressive correction procedures" included in the policy. (*Id.*). In such cases, the supervisor, "may decide, *at its sole discretion,* that some or all of the steps in the corrective disciplinary process should not be followed and that immediate action, including termination of employment, is necessary based on the totality of the circumstances." (*Id.*) (emphasis added).

On December 21, 2004, Plaintiff filed a two-count First Amended Complaint against Defendant [DE 13]. Count I seeks relief for violation of the FMLA through retaliation. Count II alleges interference with the FMLA. Defendant moves for summary judgment on both counts against it.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Bishop v. Birmingham Police Dep't,* 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the' facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Upon review of the record and the parties' arguments, I conclude that Defendant is entitled to summary judgment as a matter of law on Plaintiff's FMLA interference claim only. For the reasons expressed below, I deny Plaintiff's claim for retaliation in violation of the FMLA.

### III. Analysis

A. Plaintiff's Retaliation Claim

Plaintiff alleges that Defendant terminated her because of her request to take FMLA leave upon the birth of her child. Plaintiff's claim is one for retaliation using circumstantial evidence, and therefore Plaintiff carries the initial burden of demonstrating a prima facie case. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If Plaintiff is successful in that regard, then Defendant may rebut the presumption of discrimination by establishing that it had a legitimate, non-discriminatory reason for terminating her. *Id.; Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir. 1998); *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Finally, if Defendant sustains its burden, Plaintiff "must show by a preponderance of the evidence that the defendant's proffered explanation was a pretext for discrimination." *Arrington,* 139 F.3d at 873. Defendant does not dispute Plaintiff's ability to establish a *prima facie* case. Therefore, I will turn directly to the arguments raised by the parties in support of their remaining burdens.

1. Defendant States a Legitimate, Non–Discriminatory Reason for Terminating Plaintiff for Purposes of this Summary Judgment Motion

Defendant claims, very simply, that it terminated Plaintiff because a resident complained she treated him improperly. Plaintiff responds that Defendant's reason for terminating Plaintiff is not legitimate because the identity of the decision-maker and the reason for termination remain unsettled.

■ Plaintiff correctly points out that Defendant bears the burden to produce evidence supporting its stated reason for firing Plaintiff. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993) ("[b]y producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production, and thus placed themselves in a 'better position than if they had remained silent.'") (emphasis in original). The evidence itself must be "clear and reasonably specific." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981), and there must be evidence that the employer actually relied upon the reason given in making the employment decision. *I.M.P.A.C.T. v. Firestone,* 893 F.2d 1189, 1194 (11th Cir.1990). In other words, the reason itself cannot be hypothetical. *Walker v. Mortham,* 158 F.3d 1177, 1184 (11th Cir.1998).

Although an employer bears a burden, it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. It is a burden that the Eleventh Circuit finds to be "easily fulfilled." *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir.1994). Defendant need only "produce evidence that could allow a rational fact finder to conclude" that Plaintiff was not fired for a discriminatory reason. *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1331 (11th Cir.1998).

■ Defendant demonstrates, for purposes of this summary judgment motion, that a resident complained about how Plaintiff treated him. That resident pur-

portedly reiterated his complaint to several individuals employed by Defendant, including Minkin, the Social Services Director, and C. Hernandez, the Facility Administrator. Minkin allegedly corroborated Harap's story after speaking with his roommate and his roommate's wife.

The fact that different witnesses described Plaintiff's conduct in a variety of ways (i.e., alleged abuse, abuse, failure to uphold the resident's rights) is a semantic problem only. It does not dilute the character of the evidence concerning Plaintiff's conduct. Likewise, Plaintiff's attempt to discredit the decision-making process fails in the wake of clear testimony that several of Defendant's agents served specific functions in the process that culminated in Plaintiff's termination. Plaintiff's position that a question exists about who ultimately decided to terminate her is equally flawed because it reflects an inherent assumption that there was only one decision-maker. That is not the case here, as the record establishes that both C. Hernandez and Broughton participated in the decision to terminate Plaintiff. C. Hernandez used the pronoun "we" to describe the decision-making process, and it is clear that she reached the decision together with Broughton:

> Q: So, in terms of the termination of Ms. Harley, did you recommend it to Ms. Harley, or did Ms. Broughton recommend it to you?
> A: The way that it happened, we evaluated the facts that we had, we looked at the policies and procedures and said to Ms. Broughton, I think that we don't have a choice, that this would be considered a violation of the patient's rights,

and verbal abuse, what do you think; and she says, I believe so. I said, if that is the case and you agree with it, we have to terminate Ms. Harley; and she said, I agree with you.

(Depo. of Caridad Hernandez, 20:3–20:14). To the extent there is any confusion regarding this issue, it exists because of the nature of the questioning at the supervisors' depositions. For example, defense counsel asked Plaintiff whether she ever said that she was "the person who terminated" Plaintiff. (Depo. of Iona Sue Broughton, 17:17–17:20). Broughton quickly clarified that she was "the one who told [loan] that she was terminated," but that she "did not make the sole decision alone." (Depo. of Iona Sue Broughton, 17:21–17:24). Broughton also stated that if she ever described herself as the sole decision-maker, that description was inaccurate. (Depo. of Iona Sue Broughton, 17:24–18:5).

While the details of every interaction between Plaintiff and Harap are somewhat vague, the general nature of Harap's complaint is specific enough. Likewise, the testimony concerning the identity of the decision-makers is consistent despite the slight nuances in how the decision was communicated to Plaintiff. Defendant's legitimate, non-discriminatory reason for firing Plaintiff, her poor treatment of Harap, is supported by sufficient evidence to satisfy the relatively low threshold at this point in the analysis. I reiterate that I accept this evidence as sufficient for purposes of the summary judgment motion, but I do not find this matter as an undisputed fact for purposes of Federal Rule of Civil Procedure 56(d).[7]

---

7. Rule 56(d) provides that:

   [i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages

2. Plaintiff Demonstrates a Factual Issue Concerning Pretext

Since Defendant has offered a legitimate, non-discriminatory reason for its actions, the burden shifts back to Plaintiff to prove that, "the proffered reason[s] [were] not the true reason[s] for the employment decision," and that it was her request for FMLA leave that motivated Defendant to fire her. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. It is Plaintiff's ultimate burden to prove that Defendant intentionally discriminated against her in retaliation for her inquiry about FMLA leave. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 950 (11th Cir.1991) (noting that the *McDonnell Douglas* test is just a tool for analyzing discrimination cases resting on circumstantial evidence, and that the plaintiff still bears the burden of demonstrating the defendant's intentional discrimination). She may do this by either showing Defendant's reasons are "unworthy of credence," or by showing that Defendant more likely than not acted with discriminatory motive. *Thomas v. Dade County Pub. Health Trust*, 177 F.Supp.2d 1283, 1292 (S.D.Fla.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005). "Evidence produced in support of plaintiff's prima facie case may be taken into account to determine whether defendant's proffered reasons are pretextual." *Thomas*, 177 F.Supp.2d at 1292. Ultimately, though, to survive summary judgment, "a plaintiff need only demonstrate that a genuine question exists as to whether the reason for the decision was intentional discrimination." *Howard*, 32 F.3d at 525.

Plaintiff may meet her burden by presenting concrete evidence in the form of specific facts that demonstrate that Defendant's reasons are pretextual. *Crawford v. Chao*, 158 Fed.Appx. 216, 219 (11th Cir. 2005), reh'g denied and reh'g en banc denied, 179 Fed.Appx. 685 (11th Cir.2006) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990)). Mere conclusions are insufficient. *Id.* If Plaintiff cannot produce sufficient evidence whereby a reasonable factfinder could conclude that Defendant's reason for terminating her was pretextual, then summary judgment should be entered in Defendant's favor. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir.2000) (affirming summary judgment in the defendant's favor where the plaintiff failed to "produce sufficient evidence to create a genuine issue of pretext. . . ."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir.2001) (affirming entry of summary judgment in city's favor where the record, as a whole, lacked "sufficient evidence to convince a reasonable jury that the City's proffered reasons for terminating [the plaintiff] were pretext for discrimination.").

██ A plaintiff can prove pretext in two ways: (1) by showing that the legitimate nondiscriminatory reason should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reason. *Standard* 161 F.3d at 1332 (11th Cir.1998); *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163–64 (2006) (affirming district court's denial of summary judgment where plaintiff failed to show directly or indirectly that the defendant's proffered reason was pretextual or unworthy of credence). All the plaintiff has to do is cast doubt on

or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the

action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

the proffered reason to such a degree that a reasonable factfinder could conclude that the legitimate reason did not precede the employer's decision. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997).

With regard to the first category, a plaintiff can accomplish this undertaking by exposing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence.' *Standard,* 161 F.3d at 1333 (quoting *Combs,* 106 F.3d at 1538); *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 ("[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). Still, if the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue" in the face of "abundant and uncontroverted independent evidence that no discrimination had occurred," then an employer is entitled to judgment as a matter of law. *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097.

Plaintiff essentially argues that the reasons given by Defendant for terminating her are pretextual. Plaintiff challenges Defendant's position in this regard by arguing that: (1) the identity of the decisionmaker is in dispute; (2) Defendant changed its proffered legitimate, non-discriminatory reason; (3) Defendant violated its own policies in terminating Plaintiff; (4) similarly-situated employees were not terminated for committing the same offense; (5) there is a temporal proximity between Plaintiff's request for FMLA leave and her termination; (6) witness testimony is not credible; and (7) Defendant's

legitimate reason for terminating Plaintiff was not reasonable.

■ Proof that an employer failed to follow its established policies in reaching an employment decision may be evidence of pretext. *Bass v. Board of County Commissioners,* 256 F.3d 1095, 1108 (11th Cir. 2001); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir. 1998). Thomas testified that in her experience, Defendant would suspend a CNA accused of verbal abuse, conduct an investigation, and then decide whether to terminate the CNA. (Depo. of Vinette G. Thomas, 61:20–62:7). It is undisputed that in this case, Defendant did not suspend Plaintiff prior to termination, nor did it consult with Plaintiff concerning the alleged dispute prior to terminating her.

Defendant responds that under its policy, it could terminate an employee without taking any other preliminary steps if the circumstances of the misconduct warranted. The plain language of the policy speaks for itself, Defendant says, and it clearly preserves for it the right to eliminate personnel in appropriate circumstances. However, Defendant chooses to ignore the portion of the policy addressing progressive discipline. This portion of the policy is relevant because Thomas testified that in cases of alleged verbal abuse, Defendant would suspend the accused individual and investigate the incident. If believed, Thomas's testimony suggests that Defendant's decision to immediately terminate Plaintiff under the extreme circumstances portion of the policy was an aberration. Simply put, even though Defendant bears the right to immediately terminate an employee, if it does not exercise that right in similar cases, its employment in Plaintiff's case was a mere pretext.[8]

---

**8.** Defendant further maintains that it did not violate company policy because according to that policy, suspensions are employed only

when the employee's presence on the job would disrupt the investigatory process.

Defendant tries to discredit Thomas's testimony as reflecting only her experience, and not company policy. I do not find this response sufficient. Importantly, Defendant does not introduce evidence that in prior cases of verbal abuse, it similarly exercised its right of immediate termination. Thomas's testimony casts sufficient doubt on the reason given by Defendant for Plaintiff's termination that I find that a genuine issue of fact remains on the subject of pretext.

The testimony Plaintiff presented raises another question regarding pretext in a separate context. Defendant claims that part of the reason it fired Plaintiff was because Harap feared her. According to the factual record, Harap's fear stemmed from an incident in which Plaintiff reprimanded him for reporting her conduct. Broughton, Defendant's Director of Nursing, testified that she did not know of Harap's prior complaint, and as such, she did not know whether Plaintiff was disciplined for a prior complaint raised by Harap. (Depo. of Iona Sue Broughton, 63:5–63:18). C. Hernandez knew of the complaint, and initially believed Harap raised it to Minkin. (Depo. of Caridad Hernandez, 250:21–250:25). But Minkin testified that she was not aware of a time when Plaintiff asked Harap "why did you report me" in a threatening manner. (Depo. of Maureen Minkin, 81:7–81:11). She speculated that Plaintiff might have said something of that nature to Harap's roommate, and that Harap mistakenly included that story as part of his own complaint. (Depo. of Maureen Minkin, 80:6–80:17; 152:5–152:8).

Defendant claims that it based its decision to terminate Plaintiff, in large part, on the fact that Harap feared retaliation from Plaintiff for reporting a prior incident. Nevertheless, the testimony of record reveals weaknesses in this argument. First, the record establishes that one of the two decision-makers was unaware of the prior complaint, and the other had no first-hand knowledge of it. Second, the only other staff member familiar with Plaintiff's alleged fear admitted that she did not believe Plaintiff ever threatened Harap; rather, that Harap simply confused his own story with that of his roommate.

Third, the factual record does not establish that the incident ever occurred. Even Harap's own testimony on the subject is unclear. The inconsistencies in the defense witness stories and the lack of record proof that the prior incident between Harap and Plaintiff occurred cause me concern. Defendant's version of events is inconsistent.

■ Plaintiff worked for Defendant for over three years. Allegedly, at some point in 2003, a non-violent, non-physical incident occurred involving Plaintiff and one of the residents. Defendant did not consult with Plaintiff about the nature of the incident. Instead, it relied on the statement of the resident involved and the resident's roommate, who, importantly, did not submit an affidavit in support of the Motion for Summary Judgment and was not deposed. All of these facts, together with Thomas's testimony concerning Defendant's failure to follow its own policies in addressing abuse by a CNA, raise a ques-

Such a concern did not exist in this case, Defendant posits, because Defendant had sufficient time to investigate the incident in the morning before Plaintiff arrived for her three o'clock shift. A closer inspection of the policy language reveals, however, that the work disruption concern is only one example of when a suspension might be the appropriate course

of action in dealing with an employee disciplinary issue. (PSF, Ex. N) ("*[f]or example,* suspension *may be* warranted when a[ ] employee's presence on the job constitutes a threat to employees or patients...company officials may suspend a[ ] employee pending a decision as to the appropriate disciplinary action to be taken, if any.") (emphasis added).

tion as to whether Defendant's reason for terminating Plaintiff was pretextual and whether Defendant's true motive for firing Plaintiff stemmed from her earlier request for leave under the FMLA.[9]

## B. FMLA Interference

Plaintiff asserts that Defendant unlawfully interfered with her rights under the FMLA when it terminated her shortly after she inquired about taking leave for the impending birth of her child. Defendant denies Plaintiff's interference claim on grounds that Plaintiff was not entitled to FMLA leave for the birth of her child at the time she discussed the matter with Defendant.

Congress enacted the FMLA for the express purpose of providing employees with reasonable leave for certain medical and related conditions, including the birth or adoption of a child. *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 763 (5th Cir.1995); *Jennings v. Parade Publ'ns*, No. 01 Civ. 8590(TPG), 2003 WL 22241511 at *2 (S.D.N.Y. Sept.30, 2003). 29 U.S.C. § 2612 provides that an eligible employee

---

**9.** Because of this determination, I need not consider the remaining grounds cited by Plaintiff in support of pretext. Even still, I will remark here briefly on the validity of those additional grounds. Plaintiff's position that Defendant's reason for terminating her was pretextual because similarly situated CNAs accused of abuse were treated more favorably is flawed. Neither of the decision-makers in this case reached the disciplinary decisions in either of the comparator situations relied upon by Plaintiff. Therefore, Plaintiff cannot rely upon the examples in those situations to demonstrate pretext. *Green v. New Mexico*, 420 F.3d 1189, 1195 (10th Cir.2005) (district court properly found no evidence of pretext because allegedly similarly situated employees did not report to the same supervisor as the plaintiff, and stating that "[a] similarly situated employee is one who 'deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.'") (citation omitted); *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 692 (8th Cir.2002) (affirming judgment of district court finding that no similarly-situated employee received more favorable treatment than the plaintiff in the absence of evidence that the decision-maker was the same for the plaintiff and the designated comparator). Plaintiff also cannot meet her pretext burden by reiterating the temporal proximity between her request for leave and her termination. This finding assists Plaintiff in proving her *prima facie* case. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716–717 (11th Cir.2002). However, it is true that the evidence submitted in support of a *prima facie* case may be reconsidered at the pretext stage. *Thomas*, 177 F.Supp.2d at 1292(citing *Reeves*, 530 U.S. at 143, 120 S.Ct.

2097). Nonetheless, a two-week delay between protected activity and an adverse employment action is not sufficiently probative of intentional discrimination, on its own, to demonstrate pretext. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("temporary proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."). Were I to find otherwise, there would be no reason for shifting burdens to the plaintiff to demonstrate pretext; satisfaction of the elements of the *prima facie* case would be enough to deny a defendant's motion for summary judgment. This is not what is intended by the *McDonnell Douglas* framework and its progeny. Plaintiff's next pretext argument centers on the testimony of the defense witnesses. She essentially asks this Court to disregard the testimony by Defendant's witnesses because they have been "exposed as liars." Plaintiff's inflammatory statement goes too far, but to the extent that there are inconsistencies in that testimony, I have addressed that in section III–A–2. Plaintiff then characterizes Defendant's ground for terminating Plaintiff as pretextual because it was not possible for Plaintiff to abuse Harap given his "belligerent and overbearing nature." I agree with Defendant's observation that the factual record does not support this conclusion. Plaintiff concludes her pretext presentation by stating that the combined effect of the seven categories of pretext evidence compel a denial of summary judgment. Apart from the reasons given, I do not conclude that any of the other categories of pretext identified by Plaintiff raise questions of fact.

may take 12 workweeks of leave during a 12–month period when any of the following occurs:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

■ An employee is eligible under the statute when she has been employed: (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12–month period. 29 U.S.C. § 2611(2)(A). Absent complications, the FMLA period of leave for the birth of a child begins running on the date the child is born. *Johnson v. Morehouse College, Inc.*, 199 F.Supp.2d 1345, 1358 (N.D.Ga.2002) (the plaintiff's FMLA leave began to run the day she gave birth, regardless of the fact that she was on paid administrative leave at the time).

■ In addition to identifying rights, the FMLA specifically protects employees form interference with those rights. *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir.1999). Specifically, it is illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by the FMLA." 29 U.S.C. § 2615(a)(1). A plaintiff claiming interference must dem-

onstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled. *Nance v. Buffalo's Cafe of Griffin, Inc.*, No. 1:03–CV–2887–WSD, 2005 WL 2148548 at *3 (N.D.Ga. Mar.30, 2005).

■ Defendant contends that it could not have interfered with Plaintiff's rights under the FMLA because at the time she inquired about leave, she was not eligible to take that leave. Plaintiff's position, although seemingly unfinished in logic,[10] is that when she inquired about maternity leave, she invoked a right to which she would become entitled.

The focus of my inquiry will be on the inherent eligibility question raised by Defendant's brief. That is, was Plaintiff eligible for protection against interference with her rights under the FMLA when she inquired about taking maternity leave months before her child was due? The closest Eleventh Circuit case is *Walker v. Elmore County Bd. of Educ.,* 379 F.3d 1249 (11th Cir.2004). In that case, a school teacher sued the school board for FMLA interference. The teacher's one-year contract provided that the school could elect not to renew her teaching contract after the year expired. *Id.* at 1250. The teacher found out she was pregnant midway through the first year on her contract. *Id.* Approximately four months before she was due, the teacher asked her principal what she needed to do to obtain maternity leave. *Id.* The principal recommended that she wait until her contract was renewed before submitting a formal request for leave. *Id.* at 1250–51. The school board ultimately decided not to renew the teacher's contract and the teacher sued the school board for interfering with her rights under the FMLA. *Id.* at 1251.

---

**10.** The section of Plaintiff's Response to Defendant's Motion for Summary Judgment on the interference claim literally trails off in mid-sentence.

The teacher's theory of recovery was that the FMLA protected her request for leave regardless of her entitlement to such leave. *Id.* at 1253. The Eleventh Circuit ruled against the teacher, stating that "[w]hile we do not reach the question of whether one can attempt to exercise a right under the FMLA that one will have in the future, we hold that the statute does not protect an attempt to exercise a right that is not provided by FMLA, i.e., the right to leave before one becomes eligible therefor." *Id.* The teacher in the *Walker* case was "ineligible" because her leave would not have commenced before the end of her year contract, or within the time frame she was employed by Defendant.

There is no question that had Plaintiff given birth immediately prior to requesting maternity leave, she would have been entitled to such leave because she had worked the requisite number of months and hours for Defendant. Rather, the eligibility question raised by Defendant emphasizes the timing of Plaintiff's entitlement to leave under the FMLA. This case falls squarely within the penumbra of the question the Eleventh Circuit declined to address, namely, whether the FMLA protects an eligible employee's right to prospective leave. Resolution requires a determination as to what is the triggering event for purposes of initiating FMLA protection: the birth itself, or plans made in contemplation of the impending birth.

I will begin with a closer look at the statutory language that Congress engaged to protect employees. The FMLA states that an eligible employee is entitled to 12 weeks of leave *"[b]ecause of* the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A) (emphasis added). The regulations implementing the FMLA provide that "[c]ircumstances may

require that FMLA leave begin before the actual date of birth of a child. An expectant mother may take FMLA leave pursuant to paragraph (a)(4) of this section before the birth of the child for prenatal care or if her condition makes her unable to work." 29 C.F.R. § 825.112(c). Both of these pronouncements, especially when considered together, lead me inexorably to the conclusion that, unless unique circumstances exist, a pregnant employee is only entitled to protection against interference with her FMLA rights once she delivers her baby and the circumstance of her needing leave arises.

The Seventh Circuit addressed similar issues in *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950 (7th Cir.2004). The employee in that case sued his employer for violating the FMLA for refusing to allow him leave during the time of his wife's pregnancy. *Id.* at 952. A few days before her due date, the plaintiff's wife experienced false labor pains. *Id.* Two days after his wife's due date, but before she had delivered, the plaintiff requested leave. *Id.* He did not mention his wife's complications to his employer. *Id.* The employer did not authorize the requested leave at that time, and the employee did not return to work. *Id.* at 953.[11] The employer eventually terminated the employee on account of his unexcused absences. *Id.* Critical to the Seventh Circuit's reasoning was the fact that:

> [b]eing pregnant, as distinct from being incapacitated because of pregnancy or experiencing complications of pregnancy that could include premature contractions which unless treated by drugs or bed rest might result in the premature birth of the baby, is not a serious health condition within the meaning of the statute or the applicable regulations.

11. The employer claims that it denied the plaintiff's leave because he failed to fill out a form regarding the medical condition necessitating leave. *Id.* at 953.

*Id.* at 952 (citing 29 C.F.R. §§ 825.112(c), 825.114(a)(2)(ii), (e)). The Seventh Circuit was reluctant to find that the mere request for leave during the term of a normal pregnancy triggers an obligation on the employer to investigate whether an employee is entitled to leave. *Id.* at 953. It expressly stated that its holding simply required the employee to put the employer on notice of a probable basis for FMLA leave. *Id.* A note from the plaintiff's wife's obstetrician concerning her complications would have suffced in that case. *Id.*

Although *Aubuchon* addresses the triggering-event question in a slightly different context, its logic extends to this case. At the time Plaintiff inquired about maternity leave, she was months away from giving birth. In fact, Plaintiff testified that in response to her inquiry, Broughton told her to come back closer to the time her baby was due, or December 2003. This conversation did not put Defendant on notice of Plaintiff's right to entitlement to immediate leave any more than the plaintiff's request for leave did in the *Aubuchon* case. Plaintiff's case is even one more step removed from *Aubuchon* because Plaintiff testified that her conversation with Broughton surrounded only *how she would go about* obtaining leave in the future. In fact, the reason Plaintiff sought the information had nothing to do with her medical condition at all, as the factual record is devoid of evidence that Plaintiff suffered a medical condition either related or unrelated to her pregnancy. Plaintiff never testified that Broughton denied her request for maternity leave, or that she needed maternity leave, or any other form of leave, when she spoke to Broughton shortly before her termination. She merely wanted to confirm the process of obtaining leave because Broughton had previously denied her request for personal leave. Plaintiff did not require FMLA leave when she went to speak with Broughton about the process of applying for leave, and she

was therefore not entitled to leave at that time. As such, Plaintiff has not raised a genuine issue of fact that she was denied a right to which she was entitled. I will enter summary judgment in Defendant's favor on Plaintiff's FMLA interference claim.

Accordingly, I conclude that Defendant's Motion for Summary Judgment should be DENIED as to Count One, but GRANTED as to Count Two. Based on the foregoing, it is hereby ORDERED AND ADJUDGED that: · ·

1. The Health Center of Coconut Creek, Inc.'s Motion for Summary Judgment [DE 29] is GRANTED IN PART.

2. The Health Center of Coconut Creek, Inc.'s Motion for Summary Judgment [DE 29] is DENIED as to Count I, and GRANTED as to Count II.

3. The Pretrial Conference in this matter remains set for May 31, 2006 at 3:00 p.m. This case remains scheduled for trial during the two-week trial period beginning June 26, 2006.

### ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION

This cause came before the Court on Defendant's Motion for Reconsideration of the Court's Denial of Summary Judgment on Plaintiff's FMLA Retaliation Claim [DE 93], filed September 25, 2006. For the reasons discussed below, Defendant's Motion is denied.

I. Background

On May 10, 2006, I entered an Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment. In that Order, I concluded that Plaintiff had created a question as to whether Defendant's purported reason for terminating the Plaintiff was pretextual, and whether

the Defendant's true motive for terminating the Plaintiff was in retaliation for her earlier request for leave under the FMLA. Defendant now requests that this Court reconsider that decision.

## II. Standard

Motions for reconsideration may be brought pursuant to Rule 59(e) or Rule 60(b). *See Mahone v. Ray,* 326 F.3d 1176, 1178 n. 1 (11th Cir.2003); *see also Williams v. Cruise Ships Catering & Service Int'l, N.V.,* 320 F.Supp.2d 1347, 1357 (S.D.Fla.2004). A motion for reconsideration falls under one of these two Rules depending on "the time at which the motion is served. If the motion is served within ten days of the rendition of the judgment, the motion falls under Rule 59(e); if it is served after that time, it falls under Rule 60(b)." *Williams,* 320 F.Supp.2d at 1357; *see also Mahone,* 326 F.3d at 1178 n. 1. Here, the motion was filed four months after the Order. Therefore the motion falls under Fed.R.Civ.P. 60(b).

Fed.R.Civ.P. 60(b) provides that a Court may grant a motion for reconsideration under certain circumstances, as follows:
(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it was based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of judgment.

A district court's denial of relief under Rule 60(b) is reviewable for abuse of discretion. *Jackson v. Crosby,* 437 F.3d 1290, 1295 (11th Cir.2006).

## III. Analysis

Defendant argues that new evidence has been discovered which, if reviewed by this Court, would change my determination on the retaliation claim. This new evidence, according to Defendant, stems from information discovered during the state case in which Plaintiff alleged pregnancy discrimination against the Defendant.

Defendant relies primarily upon information concerning whether the Defendant followed its own procedures in the way it handled Plaintiff's termination following a patient's allegations of verbal abuse by the Plaintiff. Indeed, the Defendant's failure to follow its customary policies was, in large part, the basis of my decision that the Plaintiff had raised the question of pretextual termination. However, the "new" information presented by the Defendant in its current motion does not change my determination.

Defendant informs this Court that during the trial of the state lawsuit, it was established that the policy manual was merely a "guide" rather than an actual policy. Defendant further claims that the manual examined by this Court in making the decision on summary judgment was a different version than the one in place at the time of Plaintiff's termination. Finally, Defendant notes that at trial, more evidence was presented regarding the ways in which the Defendant handled similar offenses by other employees. All of this information together, the Defendant argues, clearly shows that the Defendant followed its own policies in its termination of the Plaintiff, and that the Plaintiff will be unable to prove otherwise at trial.

In my Order denying summary judgment on Plaintiff's FMLA retaliation claim, I considered the policy manual along with evidence regarding disciplinary actions taken against other employees. I also considered the way in which the Defendant handled the Plaintiff's termination, as well as the temporal proximity of the Plaintiff's request for leave under the FMLA and the Defendant's termination of the Plaintiff. My determination that these factors together created a question as to whether Defendant's reason for terminating the Plaintiff was pretextual does not change in light of the additional evidence gleaned from the state case.

Finally, Defendant argues, with no legal support whatsoever, that:

> At summary judgment the Court found a legitimate non-retaliatory reason for Defendant's decision to termination the Plaintiff, but declined to regard this finding as an undisputed fact for purposes of Rule 56(d). However, with the jury verdict in the state court case, Plaintiff is now precluded from re-litigating this fact. [DE 93 at 10].

The Defendant is mistaken. At summary judgment, I did find that the Defendant had presented a legitimate non-retaliatory reason for Defendant's decision to termination the Plaintiff, but I also found that the Plaintiff had created a question on the issue of pretext. Simply because the state court found that Defendant's reason was valid does not mean that the case cannot go forward in this Court on the issue of whether the Defendant's proffered reason was pretextual. Defendant claims that Plaintiff's request for FMLA leave is so intertwined with the fact that she was pregnant, that it is impossible to separate her pregnancy discrimination claim from her FMLA retaliation claim. However, as much as Defendant tries to make the two claims identical, they are not. The claims are brought under different statutes, with different standards. Pregnancy discrimination is simply not identical to FMLA retaliation, and the fact that Defendant successfully defended itself against the one is not proof of the other.

In spite of any new evidence brought forth during the trial of the state case, the Defendant has failed to demonstrate that this Court's earlier ruling on summary judgment was erroneous and that the extraordinary remedy of reconsideration is appropriate here.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that: Defendant's Motion for Reconsideration of the Court's Denial of Summary Judgment on Plaintiff's FMLA Retaliation Claim [DE 93] is **DENIED**.